May it please the court, my name is Julie St. John and I represent the plaintiff appellant in this case, Charles Eric Foerster. This is a First Amendment retaliation case where a police chief who was suspended and had no official duties whatsoever went outside of any regular chain of command to report the potential blackmail of a city council member and the subsequent malfeasance. The district court erred when it held plaintiff was acting within the scope of his official duties despite the fact that he was suspended and had no official duties. Accordingly, we ask this court to reverse the district court's decision, deny defendant's alternative arguments for dismissal, and remand for further proceedings. I want to focus on three issues today, the first and foremost being the speech as a citizen, which I think is probably the primary issue that we're here for today. I'm also going to touch briefly, time permitting, on whether this speech was on a matter of public concern and also on municipal liability. In Garcetti, the Supreme Court held employees who make public statements outside the course of performing their official job duties retain some possibility of First Amendment protection because that is exactly the kind of activity engaged in by citizens who do not work for the government. Since Garcetti, the Supreme Court in Lane and this court in Gibson v. Kilpatrick have provided further guidance on how courts must analyze whether an employee was speaking as a private citizen or within the scope of their official duties. Overall, the key is that such an inquiry requires a practical inquiry. That is what needs to be examined. In this case, a practical inquiry must focus on the critical question of whether Forrester could conceivably act within the scope of any official duties given the fact that when he spoke, he was suspended and relieved of all duties. Instead of doing such, the district court relied on nondispositive factors and a flawed premise of law. Specifically, by relying on Williams v. Dallas Independent School District, they concluded that speech concerning the fulfillment of a plaintiff's daily operations or reflecting special knowledge gained through the course of performing his official duties is indicative of speech as a public citizen. However, neither of these factors alone is dispositive of speech being within a public official's job duties. This court has made clear in Charles v. Grief that to hold that any employee's speech is not merely protected because it concerns facts that he happened to learn while at work would severely undercut First Amendment rights. And in Gibson, the court made clear that when summarizing Garcetti, whether speech concerns the subject matter of employment is not dispositive to the analysis of whether an employee spoke within the scope of any official job duties. Unlike Williams, here a practical inquiry must focus on the critical question, or excuse me, the critical fact that Forrester was suspended when he spoke. These non-dispositive factors regarding whether his speech was concerning his duties as police chief and whether he learned about this information because of his job are, in our argument, essentially meaningless when viewed in context of the suspension. When an employee is suspended and has no official duties, it is impossible in any way, shape, or form for that employee to act within the scope of those official duties. It would be the equivalent of saying that a suspended CEO or president of a corporation could nonetheless go out and buy a corporate jet, even if that was something that he were able to do while he was employed. It wouldn't be something that would be permitted if he was suspended. And importantly, it is uncontested that at the relevant time Forrester had no official job duties. In the record at page 77, in Defendant's Motions for Judgment on the Pleadings, they wrote, Forrester had no choice but to write and send the email from home. He was banned from City Hall. He was not allowed to even come to City Hall, let alone perform any official duties as the police chief. Do we have any of these other termination, first-member retaliation cases involving a plaintiff who was suspended during the communique? I was unable to find any precedent where there was a suspension and then the speech took  In addition to the fact . . . You are still an employee when you're suspended, right? Or are you disagreeing with that? You are still an employee, but regardless of being an employee, it doesn't mean that you have official duties that you are supposed to be doing, would be our argument. In addition to the fact that he had no duties, I would also argue that this is quintessential free speech because he did go outside of any sort of regular chain of command when he was on his own time, from his own personal email, his own personal computer, while he was at home. He didn't sign the communication as Chief Forrester or anything like that to report to select elected officials that there was potential blackmail and malfeasance. And emailing elected officials on your own time is exactly the type of engagement that citizens typically do who do not work for the government. Normally, I suppose, the police would not be allowed to communicate ex parte with counsel, right? In the city manager government form? I do not know the answer to that. Well, obviously, he told Mr. Keeper when Singleton phoned him to respond honestly to the inquiry, but Keeper wasn't to initiate contact with counsel, and I assume even the police chief wasn't supposed to. Oh, I misunderstood your question. I apologize. Yes, I think that is correct. The city charter made it clear that city council members are not supposed to interfere with these types of investigations, but my client did tell the sergeant who the city council member had contacted who had conducted the investigation to obviously just respond honestly, and then he obviously went to the city manager about this issue at that point. As it did with Forrester's suspension, the district court acknowledged the fact that Forrester diverged from any chain of command when he went to select members of the city council. It did not give these facts any weight in its analysis. Overall, we would argue that the district court erred when it held that a public employee who went outside of any regular chain of command to report potential blackmail and subsequent wrongdoing was acting within his official duties. If there are any other questions on that issue before I move on to my second issue today? Are you familiar with the Anderson v. Valdez litigation? Yes, I am, Your Honor. Do you think it is good for your client or not? I think it is. I think that obviously there are two, the Anderson 1 and Anderson 2, I think as they're referred to in the briefing, and I think Anderson 1 is particularly helpful, and I actually believe that your dissent in that case, Judge Jones, is particularly helpful as it makes clear that Garcetti's rule is to conduct a practical inquiry and look at the official job duties. It's not about anything else other than looking at official job duties. You referenced in your dissent that the majority in that case talked a lot about agency law and things like that, but that's not the purpose of this. The purpose of the practical inquiry under Garcetti is to look at whether or not the speech is within the scope of the official duties, so I believe it is helpful. Then I will move on to my second issue talking about whether or not this speech was on a matter of public concern. Obviously we believe it was, as it brought to light evidence of potential blackmail of the city council and potential subsequent malfeasance. Obviously in Lane, the court made clear speech involving matters of public concern, speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of legitimate news interest. This court has made clear since 1988 in Bronner v. City of Richardson, Texas, that speech disclosing misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, and also in Anderson in 2016, that any evidence of corruption, impropriety, or other malfeasance on the part of officials in terms of content clearly concerns matters of public importance. By the way, is the list of misdeeds by the chief in the record? In other words, police sent him a list of supposedly ten things that he had done wrong which justified suspension, and the briefs only talk about number ten. So where are the other nine? They are in the record, and I do not have that citation off the top of my head. Okay. But they are in the record on appeal. They were actually submitted as an exhibit to when defendants filed their motions for judgment on the pleadings is where they're located. An unusual posture, but fine. In terms of content, obviously, releasing the speech to the public would release more than just an employment grievance. Obviously, defendants argue that this is simply an employment grievance, that it's nothing more, but when you take into account this court's precedent, especially Kennedy v. Tandor Poe's parish library, if releasing the speech to the public would inform the populace of more than the fact that the employee's employment grievance, then the content of the speech may be public in nature. And here, Forrester provided information about potential blackmail, and he also provided the city council members, the uninvolved city council members, and the mayor with the actual information being used to blackmail that city council member. So releasing the speech as a whole to the public would be clearly more than an employment grievance, unless the content does show that this would be a matter of public concern. The same goes for the form. Obviously, with form, you look at two factors, the simple form or format, and also the speaker's motivation. Now, the form and format were obviously a personal email sent from a personal computer on his own time, but more importantly is his motivation. And he was motivated by the fact, sending this to those uninvolved city council members and the mayor, was to disclose what was going on with this potential city council member being potentially blackmailed by one of the officers. And plaintiff sought to clarify in his first amendment complaint, which the district court did not decide or give permission to enter. The district court did not make a ruling on that. But in plaintiff's first amendment complaint that was attached as an exhibit to our response to defendant's motions for judgment on the pleadings, Forrester further clarified, specifically pleading that he sent the email to the mayor and city council with the exception of Singleton because he wanted them to be aware of potential blackmail and misconduct. And because this is a case that was dismissed on a motion for judgment on the pleadings, the pleadings must be taken as true and construed in the light most favorable to my client. Thus, the form also indicates that this would be a matter of public concern. The context does as well. I think the most relevant precedent in terms of this factor would be Salge versus Edna Independent School District, which weighed the context factor in favor of the plaintiff because her position was as a high school secretary. Her responsibility was for maintaining good communication between the school and the community. Her 33 years of experience in the school system and the former principal, who she was talking out about, was a prominent position in the community. I have one other question. The parties both re-state in about one or two, or the district judge and the appellee states in one or two sentences, the Texas Constitution for protection of free speech parallels that of the U.S. Constitution. Has the Texas Supreme Court adopted Garcetti? I do not know the answer to that. Well, I assume somebody would have cited a case on it if it had been adopted. Has the Texas Supreme Court adopted Pickering for that matter? I do not know the answer to that question, and I did not look into that. But my understanding is that they do mirror each other, so I would assume there is an adoption out there, but I do not know. I can't state that conclusively. Okay. And with my last minute remaining, I would like to touch briefly on the issue of municipal liability. In this case, we would argue that the city manager is a final policymaker based on a plain reading of the city charter and its associated documents. As you've seen, the city charter is also in the record. It is also around page 86. You will see where the charter is located, and it provides the council with all powers subject to the limitations imposed by the charter. The charter then limits the council's powers and grants policymaking authority as it relates to I personally don't see how the firing of the police chief could be anything but an action by the municipality or by police. So without commenting on the rest of the decision, I just don't understand that it's not municipal conduct. Okay. I agree. I agree with you, and there is one thing that I would like to point out on this issue. It's not in the briefings, because I discovered it during preparations for today, but in the I may have just a second to finish. Yes. Thank you. They write, The department heads may, with approval of the city manager, adopt supplemental personnel policies, procedures, and work rules. So if it wasn't clear enough by the charter, the city's personnel policy further specifies that the city manager would be a final policymaking official. Okay. Thank you. Mr. Beata? Thank you. May it please the Court, Judge Jones? This is, in my view, a very straightforward case. There were two instances of speech, both that were uttered by the chief of police as a city employee. We have the September 15th memo concerning Councilman Singleton that he wrote and signed as chief. It concerned morale issues in his department. He framed it in terms of charter issues. The charter specifically allows for council members to contact individual city employees for purposes of asking questions. That's what he alleged. It wasn't the charter forbids giving orders to city employees. The charter forbids the council directing the city manager to hire or fire anyone. But it doesn't forbid. In fact, it expressly accepts out. So how was he supposed to respond when Mr. Keeper came to him and said, Councilman Singleton is sniffing around here? Yeah. He certainly is, as the department head, he is certainly in his place as the police chief to contact the city manager and tell him, there is a council member that's asking questions. I think that that violates the spirit of the charter, although the charter specifically allows asking questions. He then says, one can view this as the council member looking in on my performance. That's one thing you can look at. One could, couldn't one, under these circumstances? I'm sorry? I'm suspicious, and I can certainly understand why he was suspicious. But he did not say anything improper to Keeper. Did he? No. The chief. Did Singleton say anything improper? No. The chief. I don't care. Singleton prompts the discussion, which was taped. And the chief said nothing improper to Keeper, right? Well, Mr. Blease thought that some of the conversation was disrespectful. Oh, I thought he probably called to fix a ticket or something like that. That was a gratuitous remark to a subordinate about a councilman that may be viewed as disrespectful. That's possible. But I'm not saying that there was anything untoward about those discussions for purposes of this argument. The point of this part of your argument, I take it, is that he was inevitably functioning in his capacity as the chief of police. He was. Well, let me just suggest to you this other possibility, and that is that he didn't ask to have Kravitz come to him with this damning memo about a councilperson. And Blease warned him a year earlier, if that ever sees the light of day, you'll be fired. Okay? And then the worst happens, and Kravitz, there is reason to believe, to a layperson at least, that Kravitz has in fact used that memo for precisely the untoward purpose. In other words, this is not normal chain-of-command type conduct. This was arguably some sort of criminal conduct by a police officer that bled over into city council, and the chief wouldn't have even had to deal with it if they were all operating in their proper lanes, right? That's correct. What I'm building up to is Lane v. Franks. It concerned his duties, but the nature of it wasn't his duties. Well, the nature of it is that as the department head of the police department, one of his duties is to make sure that morale is high in the police department, and that is in the personnel policy manual that is part of the record. It is adopted by city ordinance. The section that— Well, how is morale going to be—well, okay, I'm sorry. The gist of the September 15th memo to the city manager is, I think this violates the spirit of the charter for him to be poking around. One can speculate that there's blackmail involved. He never says that there was blackmail involved, and that's one of the red herrings in this entire lawsuit and appeal. No one's ever accused of blackmail. It is the appearance of impropriety, not an accusation of impropriety, and that to me is one of the distinguishing factors here. The blackmail that's involved here is the city councilman, Singleton, could very well be trying to get people fired. He could very well be trying to get people fired, but the city councilman, as a councilman, has no power to fire anybody. Is he still on the council?  Is the police still the city manager? Yes. Okay. So the chief took the call. The chief got fired. That's correct. All right. So the memo deals with morale in the department, which is part of the chief's charge. He is a supervisor of the entire department. His concern was the effect of this city councilman poking around on morale in the department. That falls squarely within the employee's speech, speaking on matters relating to his position as a department head. It is directly up the chain of command. The charter issue that he's raising is one that would necessarily have been brought up with the city manager, because it's the city manager that does have the power to ask questions, that does have the power to direct city employees. And so if the chief is going to raise with somebody in the city government an instance where he feels that a city councilman has gotten out of his lane with respect to the separation of powers in city government, then that would be necessarily the city manager. Hey, this guy's getting out of his lane. He needs to be reined in. Why else would he have communicated that to the city manager if it's a crime? He can deal with it himself. If it's the blackmail situation that Zatskins, who's under the chief's supervision, is blackmailing people on city council with a memo, hey, I can embarrass you with this incident that occurred ten years ago, this violation of policy ten years ago that's going to be very embarrassing to you unless you protect me in this internal hearing. The chief could have, of course, enforced that because the officer is under his supervision, but he's bringing it up to the city manager because the city manager is the person that would be naturally the person that could communicate with the city council and say, hey, remember, I'm the boss over the city employees. I'm the one that tells them what to do. Well, another way that could work is that once all this had transpired, the city councilman, and I'm not defaming Mr. Singleton, but a person in Mr. Singleton's position might have an incentive to fire a city manager who didn't moderate the discipline against Keeper, which is what happened, I mean against Zatskins. But we don't know that unless the case went forward and there was discovery, right? Yeah, but what I'm speaking to is not the motive but the nature of the speech, that this is employee speech, that this is something that would be within the general ambit of a department head's communications with the city manager. Now, you're focusing on September 15th. Why don't you move on to the 18th? Okay, the 18th is a memorandum that Forster wrote. He addressed it to Austin Blease in response to a notice that Blease gave to Forster the day before. He said, you're on suspension, but you are expected to respond to this notice either in person, you're to come in, or you can do it in writing. So the writing is in direct response to a directive by the city manager. So he's being ordered to provide an explanation for why he shouldn't be disciplined, if any, and he did. So that speech was directly responsive to an order. Now the question is, in this case, does the fact that in addition to sending that email and all the attachments to Mr. Blease, does the communication become a citizen speech if the same memo is copied to the mayor and city council members? And I think that the answer to that is yes, because in this particular context, the city council has the hiring and firing authority over the city manager. The intent of the response, obviously, is to address each of the items on the list of concerns, of issues that Mr. Blease had, and to add that I've been a great chief. I shouldn't be fired. Why is it necessary for the city council to hear all that and to hear the whole context of it was because Blease obviously wanted the city council to check the homework of the city manager. This is not going on in the context of some publicized event. It had no publicity other than an internal communication to it. I certainly understand that, and that's a very powerful argument, but really, this is really getting into the deep state situation because the flip side of that is that he's trying to alert other members of the city council that they may have someone who's fatally compromised in regard to his duties. Isn't that right? I mean, isn't that precisely why he sent them the Zapskin memo? One can view that that is part of the intent. Well, it's clearly part of the intent. But the function is to follow the city manager's directive and provide the information and then allow somebody further up the chain to review the work for whatever— Two or three days earlier, I think, I forget whether it was September 15 or September 17, the chief had said, we're worried we're going to get fired. Right? Yes. Had this list of 10 adverse points, which are sort of intriguing to me, had this list been lying around waiting to be deployed against the chief who was otherwise being told he was a great chief? It still is employee speech. It doesn't address a matter of public concern that the employee is bringing the city council into it. I mean, for example, you know, there are these situations, and we've seen, I think, with a few of the cases of this circuit where somebody has brought a retaliation case based on conduct that—on retaliation against speech that was done as an employee, a whistleblower-type speech, but it was within a police chief's job duties to blow the whistle. And then he comes back after he's filed this lawsuit, and the mayor then continues to pick on him that they had this turf war between the mayor and the police chief. And lo and behold, the police chief gets fired. And the Fifth Circuit has even gone so far as to say that, you know, this speech that's outside—not only outside the power structure of the city, but is to a court, and that the allegation is, I was fired in retaliation for my First Amendment speech. He comes back, and it still is not a matter of public concern because it concerned himself. I mean, this concerned himself. Isn't he trying to defend himself from those charges and save his job? I'm sorry, your Honor? Isn't he trying to defend himself from Blee's charges against him and save his job? That's it. I mean, that's what he's doing. He's—you know, there are a list of things. The city manager says, I'm displeased with you in this way. It's like a grievance. You need to respond. Under Texas law, I give you this notice. You respond. He responds and says, here are the issues. Don't fire me. He has no other legal—law, does he? I'm sorry? I say he has no civil service protection under Texas law. That's correct. He's an at-will employee. Yeah, he has no civil service protection. Don't tell us about—yeah, okay. What is your support for the idea that the Texas Constitution definitely parallels Pickering, Garcetti, and all that? Well, the—I've cited appellate court cases that have— Oh, one. I didn't—yeah, I didn't read those. Were those about Garcetti or— I'm not—I don't want to tell you who it is without having reread the case, and I haven't for this argument. But I do recall going through the public concern issues and seeing that the Texas Supreme Court has adopted those. But the Texas Supreme Court has, in other contexts, in many other contexts, paralleled the federal Constitution. There may be some specific language that's unique, but to the extent that we're talking about these general constitutional rights that we see in our own Constitution, write a petition, write a free speech, the Texas Supreme Court has almost always adopted the federal approach to the Constitution. I suppose the fact that Texas has a whistleblower statute, I suppose it doesn't apply here because it wasn't raised, but that might cast some light on what Texas thinks about First Amendment protections. Yeah, the whistleblower statute obviously would not apply in this situation because he's not complaining to a law enforcement authority. He is—he raises a first concern up the chain of command to the city manager, and then he—and then in response to a request for a statement on a proposed disciplinary action, he copies to city council. Neither of those are law enforcement authorities, so this is not a whistleblower case. What's ever happened to Officer Zapskin? Is he still on the force? As my understanding, he is. Is he still a corporal? I don't know that. There are backup arguments concerning immunity, qualified immunity. There is the Teague case that in footnote 7 of the Teague case makes the point that, you know, where an employee complains to somebody higher up in the chain of command that may not have supervisory authority over the plaintiff, but wants someone to oversee what the supervisor is doing, that that still is an employee's feature. It's not—it doesn't address a matter of public concern. It's still considered part of a continuation of a grievance. This is a situation where it's a continuation of a grievance to bring this before the city council. The other—there are other cases. There's the Benney's versus, I think, Pittsburgh I.S.—it's the Pittsburgh I.S.D., the Benney's case. Hold on just a second. It's not a published opinion. It's a Benney's versus Pluckett Fed Appendix case that dealt with that kind of situation where, you know, when somebody goes to the city council, the issue is, you know, they're still internal. It's still an internal complaint. Even though the city council members may not have direct authority over the employment decision, the court says it's not—there's no clearly established law saying that that's outside and into citizen speech and into matters of public concern. Finally, there was a recent case, and I sent a Rule 28J letter that raises it. It's another—it's not a published opinion, another one, but it's the Harrison versus Lilly case that came down in March 25th of this year, and that was one where, again, the court makes reference to the fact that these cases that involve internal communications, but it may be with some employee that's not in the chain of command, it's still not clear. So, there is definitely an immunity angle to this that was not addressed by the district court, but I think given the welter of factors in a case of this nature that this kind of speech is not clearly protected. Finally, the issue of municipal liability. You've got your red light on. I'm sorry. I'll give up the podium and rely on my brief. Thank you. All right. Ms. St. John. Thank you. There are a few things that I would like to point out in rebuttal. First off, that you're exactly right, that this is not normal chain of conduct communication, and that goes for not only the original communications between the sergeant and the city council member and my client, the chief, and the city manager, but it especially goes to when my client chose to send the information that he was sending the city manager in response to the suspension. He also chose to send that to select city council members and to the mayor. So defendants would argue that this was still within the chain of command because the city council oversaw the city manager. But if this were normal chain of command type of communication, then Singleton, the compromised city council member, clearly would have been also included on that communication. Additionally, it is undisputed that the mayor has no role whatsoever in the chain of command over the city manager or the department heads, and he was also included on that communication. I think this evidence says that it is not normal up-the-chain communication as defendants try to make it out to be, and it also further goes to show his motivation in sending it. Again, if this were really a situation where he was trying to simply defend himself, why would he not have included Singleton? And why would he have included the mayor? And importantly, I would like to reiterate, I know the court is aware of this, but this was dismissed on a motion for judgment on the pleadings. And so all of the information, all the facts as pled by my client must be taken as true, and any plausible theories must be interpreted in his favor at this stage. In addition to that, the other thing that I would like to address on rebuttal is that, you know, defendants allege this is not an accusation of blackmail per se, and therefore should not be entitled to protected speech. But even if it's not an accusation of blackmail per se, he mentions blackmail, he talks about there being rumblings of blackmail within the department, and he also provides evidence, the memo that Zatskins wrote several years earlier, to the other council members and to the mayor, which would be enough, even if it's not an accusation per se, in our opinion, to be protected speech. And are there any further questions? We do have his full response with attachments and records. Yes, you do. It was, like I said before, it was one of the exhibits that was attached to defendants' motions for judgment on the pleadings. Okay. All right. Thank you very much. Thank you. Thank you.